UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ALSTOM POWER, INC., | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil No. 3:04cv1311 (JBA) |
| | : | |
| SCHWING AMERICA, INC., | : | |
| Defendant. | : | |

### Ruling on Motion for Summary Judgment [Doc. # 78]

This diversity case arises out of a contract dispute between plaintiff Alstom Power, Inc. ("Alstom"), a Delaware corporation with its principal office in Windsor, Connecticut, and defendant Schwing America, Inc. ("Schwing"), a Minnesota corporation with its principal office in White Bear, Minnesota.  Alstom brought a complaint alleging breach of contract (Count One), unjust enrichment (Count Two), negligent misrepresentation as to the goods/services to be provided under the contract (Count Three), declaratory judgment with respect to insurance coverage (Counts Four and Five), violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a et seq. and the Connecticut Unfair Insurance Practices Act, Conn. Gen. Stat. § 38a-816(b) (Count Six), and negligent misrepresentation as to insurance coverage (Count Seven).  Am. Compl. [Doc. # 66]. Defendant now moves for summary judgment on all counts, which will be granted for the following reasons.

1

## I.   Factual Background

In April 1999, ABB, a member of the Alstom Power Group,[1] was awarded a contract to construct a portion of a 150-megawatt power plant in Redbank, Australia.  Def. L.R. 56(a)1 Stmt. [Doc. # 79] at ¶¶ 2, 4.  The plant is near a coal mine and was designed to convert coal byproducts into energy.  Id. at ¶¶ 5, 7; Pl. L.R. 56(a)2 Stmt. ¶ II.5.  ABB was to provide steam generators and related equipment for the plant, a contract worth $130 million of the total $230 million (Australian dollars) Redbank budget.  Def. L.R. 56(a)2 Stmt. ¶ 10.

The parties dispute the relationship between ABB and Schwing.  ABB characterizes Schwing as a "supplier" who was to provide one component for its part of the Redbank project, a "material handling system used to store, mix and transport the coal slurry."  Id. at ¶ 12.  Schwing, by contrast, characterizes its role as a subcontractor responsible for "complete provision of a major portion of the Redbank power plant, not just for component parts, and plaintiff's bid included design, engineering, planning, specifications, services, on-site supervision, inspection and performance...."  Pl. L.R. 56(a)2

---

[1]The record is unclear concerning the relationship between ABB and Alstom.  Defendant characterizes ABB as a predecessor corporation to Alstom, and plaintiff denies this characterization but does not say what it believes the relationship to be.  Regardless, both parties' briefs assume that Alstom is the proper party plaintiff to assert claims arising under ABB's contract.

Stmt. ¶ 12.

Schwing's response to the bid package, however, proffers a "price for the <u>material handling system</u> used to store, mix and transport the coal slurry." Def. App. Ex. 4 (9/21/99 letter from Thomas Lyons to R.T. Smuda) (emphasis added). The letter further states that Schwing has "included a parts only warranty in our base equipment offering; however, we offered a price adder to incur the cost of labor. Labor to service our equipment must be provided by either a Schwing employee or authorized agent, specifically Sulzer of Australia." <u>Id.</u>

Alstom responded to Schwing's package with a 29-page purchase order dated October 8, 1999, which requested four BDT[2] storage tanks, four storage tank sliding frame silo systems, four BDT paddle mixers, and four BDT transfer pumps. Def. App. Ex. 5. Included in the purchase order was one service trip for one Schwing employee to go to Australia for two weeks. <u>Id.</u> ABB also requested various inspection and test reports, contract drawings, and instruction manual specifications. <u>Id.</u>

On October 29, 1999, Schwing responded to the purchase order with a letter acknowledging receipt of the order and assuring "successful and timely completion." Def. App. Ex. 6 at 1. The letter also requested a few modifications to the terms of the

_____

[2]Although not fully explained in the record, BDT appears to be a type of coal byproduct that is processed in the Redbank plant.

purchase order, including a limitation of warranties.  <u>Id.</u> at 2.
ABB never signed the letter to indicate its agreement to the
changed terms.  <u>Id.</u> at 6 (showing blank signature lines).

On June 23, 2000, ABB's Redbank Construction Manager
confirmed the delivery at the Redbank site of the equipment that
was ordered through the original purchase order, stating that the
goods were received and "of good quality and condition."  Def.
L.R. 56(a)1 Stmt. ¶ 19; Pl. L.R. 56(a)2 Stmt. ¶ II.19; Def. App.
Ex. 8.  Schwing billed ABB approximately $1.8 million (U.S.
Dollars), which was paid timely.  Def. L.R. 56(a)1 Stmt. ¶ 20-21;
Pl. L.R. 56(a)2 Stmt. ¶ II.20-21.[3]

On May 11, 2001, while the power plant was operating on BDT
fuel, one of the "sliding frame power cylinder trunion arms
broke," or, as plaintiff characterizes the accident, "exploded
including but not limited to a cylinder flying through the system
causing extensive and major damage."  Def. L.R. 56(a)1 Stmt. ¶
22; Pl. L.R. 56(a)2 Stmt. ¶ II.22.  Schwing, through its
contractor Parker Hannifin, replaced all eight cylinders at
Redbank.  Def. L.R. 56(a)1 Stmt. ¶ 27.  However, plaintiff
alleges that the replacement cylinders, which were due on June
30, were delayed until July 16, 2001, and then failed again in

_____

[3]Plaintiff denies that this amount represented payment in
full, given the subsequent dispute that arose between the parties
over costs of repairs in 2001-2002; however, plaintiff does not
dispute that ABB paid Schwing's original invoice, representing
the original equipment ordered.

December 2001 and in 2002 and 2003.  Pl. L.R. 56(a)2 Stmt. ¶ 27.
Plaintiff seeks damages of approximately $700,000 for replacement
material, commissioning, transportation, repair labor, and 15%
overhead.  Defendant argues that all of plaintiff's contract
claims are barred by the statute of limitations.  Defendant also
argues that most of these costs are excluded by the parts-only
warranty agreed by the parties or because the costs were not
incurred by plaintiff.

## II.  Standard

Summary judgment is appropriate under Federal Rule of Civil
Procedure 56(c) when the moving party establishes that there is
no genuine issue of material fact to be resolved at trial and
that the moving party is entitled to judgment as a matter of law.
See Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  Materiality
is determined by the substantive law that governs the case.
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In
this inquiry, "[o]nly disputes over facts that might affect the
outcome of the suit under the governing law will properly
preclude the entry of summary judgment."  Id.  "Where the record
taken as a whole could not lead a rational trier of fact to find
for the nonmoving party, there is no genuine issue for trial."
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
586 (1986).

In moving for summary judgment against a party who will bear

the ultimate burden of proof at trial, the movant's burden of
establishing that there is no genuine issue of material fact in
dispute will be satisfied if he or she can point to an absence of
evidence to support an essential element of the non-moving
party's claim.  Celotex, 477 U.S. at 322-23.  "A defendant need
not prove a negative when it moves for summary judgment on an
issue that the plaintiff must prove at trial.  It need only point
to an absence of proof on plaintiff's part, and, at that point,
plaintiff must 'designate specific facts showing that there is a
genuine issue for trial.'" Parker v. Sony Pictures Entm't, Inc.,
260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex, 477 U.S. at
324); see also Gallo v. Prudential Residential Servs., 22 F.3d
1219, 1223-1224 (2d Cir. 1994) ("[T]he moving party may obtain
summary judgment by showing that little or no evidence may be
found in support of the nonmoving party's case.").  The non-
moving party, in order to defeat summary judgment, must then come
forward with evidence that would be sufficient to support a jury
verdict in his or her favor.  Anderson, 477 U.S. at 249 ("[T]here
is no issue for trial unless there is sufficient evidence
favoring the nonmoving party for a jury to return a verdict for
that party").  In making this determination, the Court draws all
reasonable inferences in the light most favorable to the party
opposing the motion.  Matsushita, 475 U.S. at 587.  However, a
party opposing summary judgment "may not rest upon the mere

allegations or denials of the adverse party's pleading," Fed. R.
Civ. P. 56(e), and "some metaphysical doubt as to the material
facts" is insufficient.  <u>Matsushida</u>, 475 U.S. at 586 (citations
omitted).

**III. Discussion**

> **A.   Breach of Contract: Statute of Limitations**

Central to determination of this summary judgment motion is
the parties' dispute as to the applicable statute of limitations
for this lawsuit filed August 6, 2004.  The Uniform Commercial
Code, governing sales of goods, establishes a four-year
limitations period, <u>see</u> Conn. Gen. Stat. § 42a-2-725,[4] while
construction and other general contract matters have a six-year
limitations period, <u>see</u> Conn. Gen. Stat. § 52-576.[5]  Thus, the
critical issue is whether the parties' contract is a contract for
the sale of goods, as Schwing argues, or a construction services
contract, as Alstom argues.

"To determine whether a contract ... is governed by the
U.C.C., the court must determine whether the dominant factor or
'essence' of the transaction is the sale of the materials or the

---

[4]"An action for breach of any contract for sale must be
commenced within four years after the cause of action has
accrued."  Conn. Gen. Stat. § 42a-2-725(1).

[5]"No action for an account, or on any simple or implied
contract, or on any contract in writing, shall be brought but
within six years after the right of action accrues..."  Conn.
Gen. Stat. § 52-576(a).

services." Nora Beverages, Inc. v. Perrier Group of Am., Inc.,
164 F.3d 736, 747 (2d Cir. 1998) (quoting Incomm, Inc. v. Thermo-
Spa, Inc., 41 Conn. Supp. 566, 570, 595 A.2d 954, 956-57 (Conn.
Super. Ct. 1991)).  This is a fact-specific determination that
requires examination of "the main objective sought to be
accomplished by the contracting parties."  Consol. Edison Co. of
N.Y. v. Westinghouse Elec. Corp., 567 F. Supp. 358, 361 (S.D.N.Y.
1983) (internal citation and quotation marks omitted) (denying
motion to dismiss contract action relating to construction of
nuclear power plant because factual development required to
determine whether it was primarily a construction contract or
contract for sale of goods).

    The contract was formed pursuant to ABB's Bid Package
requisitioning a "BDT Storage Tank (Sliding Frame Silo System),"
Def. Ex. 3, by Schwing's acceptance of ABB's "Purchase Order,"
which sets forth a list of "deliverable items,"  Def. Ex. 5 at 1,
6.  The purchase order refers to the parties as "Seller" and
"Purchaser."  Id. at 2.  The items were to be manufactured by
Schwing either in the United States or Germany and shipped to
Australia.  Id. at 4.  Schwing provided one of its employees to
supervise installation in Australia for two weeks, id. at 4, but
the purchase order did not include the full price of labor
necessary for complete installation, which was undertaken by
another firm.  Alstom emphasizes the fact that Schwing was to

engineer and quality-test the items provided and also supply instruction manuals.  Under the U.C.C., however, "'[g]oods' means all things, including specially manufactured goods, which are movable at the time of identification to the contract...."  Conn. Gen. Stat. § 42a-2-105 (emphasis supplied).  Thus, the fact that the BDT storage tanks were specially manufactured items that required unique engineering, testing and instruction manuals for operation is not inconsistent with a finding that they are goods within the meaning of the U.C.C.

The cases plaintiff cites for the proposition that its contract is not subject to the U.C.C. are factually distinguishable.  In Insurance Company of North America v. ABB Power Generation, Inc., 925 F. Supp. 1053, 1056 (S.D.N.Y. 1996), the defendant was retained to construct an entire power generation facility, including "design[ing] and construct[ing] the facility and procur[ing] necessary equipment."  The contract, which "define[d] [the] defendant's undertaking as 'services,'" obligated the defendant -- denominated as a "contractor" -- to "provide [the owner] with a Project that functions...."  Id. at 1061.  Likewise, in Niagara Mohawk Power Corporation v. Graver Tank & Manufacturing Company, 470 F. Supp. 1308, 1324 (N.D.N.Y. 1979), the contract obligated the "contractor" to "provide all the materials, equipment and apparatus, ... all the labor, tools, services and facilities ... [and] perform all the work and do all

9

things necessary for the proper construction and erection and completion" of a "containment liner" in a nuclear power plant. Here, Schwing was obligated to provide certain component parts of the Redbank plant but not to install those parts. The contract did not require Schwing to provide "all the labor, tools, services and facilities," compare id., but only obligated Schwing to provide one employee to oversee another subcontractor's work. Finally, the purchase order issued by ABB requests "deliverable items," not "services," and the bid package offered by Schwing is for the component parts of a "material handling system," not for the construction services associated with that system. The fact that Schwing designed and engineered the system does not transmute the purchase order into a construction contract.

For these reasons, the Court concludes that this contract is predominantly one for the sale of goods, governed by the U.C.C. Accordingly, a four-year statute of limitations is applicable.

Plaintiff's original complaint [Doc. # 1] was filed on August 6, 2004. Thus the question is whether any breach of contract is alleged to have occurred within four years of that date. Schwing contends that its performance of the contract was complete on June 23, 2000, when ABB's John King sent an email to Schwing confirming that the "BDT Bins and Support structures" were "received at [the Redbank] site and ... [are] of good quality and condition." Def. App. Ex. 8. Alstom, however,

contends that performance was not complete in 2000, but
"continu[ed] into 2001 and 2002" due to the "failure with the
sliding frame cylinder arrangement," which was not fully repaired
until July 16, 2001, and failed again in 2002.  <u>See</u> Pl. L.R.
56(a)2 Stmt. ¶ 19.

Alstom conflates two different issues.  Although Alstom
contends that the 2001 sliding frame cylinder failure breached
the contract, this is a separate question from when Schwing
completed its original performance pursuant to the purchase
order.  Schwing's parts were delivered to Redbank on June 20,
2000, <u>see</u> Def. App. Ex. 8 ("All Items Report"), and there is no
material dispute of fact that ABB certified Schwing's delivery
complete and of acceptable quality as of June 23, 2000, <u>id.</u> at
Ex. 8 (e-mail from John King to Keith Ireson).  There is also no
genuine dispute that the Redbank power plant was fully
constructed and operating before Spring 2001, because the
cylinder failure occurred during the firing of BDT fuel.
<u>See</u> Def. L.R. 56(a)1 Stmt. ¶ 22; Pl. L.R. 56(a)2 Stmt. ¶ 22.  The
real dispute between the parties thus is whether the cylinder
failure is covered under the agreed warranty, not whether Schwing
completed performance under the contract initially.[6]

---

[6]Although the Court finds that breach of warranty is the
proper characterization of the parties' dispute, Alstom expressly
disclaims a breach of warranty claim.  Pl. Mem. in Opp. to Def.
Summ. J. Mot. [Doc. # 96] at 1 ("Plaintiff's Amended Complaint
dated November 3, 2005 (the operative complaint) alleges breach

Under Conn. Gen. Stat. § 42-a-725(2), a "breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered."  The operative[7] warranty language in the Alstom-Schwing agreement, which is an amendment[8] to the purchase order, reads: "Schwing America, Inc. to include two (2) year parts only warranty or [sic] thru 9-30-02.  This warranty does not obligate Schwing America Inc. to bear the cost of labor in replacement of defective parts or the cost of transportation of such parts."  Def. App. Ex. 5 at 16.

This warranty is not an explicit guarantee of future performance, such as would be required under § 42a-2-725 to toll the statute of limitations until the time the defect is discovered.  The parties' agreed language is a "parts only warranty" obliging Schwing to "replac[e] ... defective parts."

of contract, and does not allege breach of warranty.").

[7]Schwing proposed additional language to the warranty ("This warranty is in lieu of any other warranty expressed or implied...") in a letter sent to ABB on Oct. 29, 1999, see Def. App. Ex. 6, but ABB never agreed to the modification.

[8]Although ABB contends that their boilerplate warranty language on the following page of the purchase order applies, the purchase order explicitly sets forth the negotiated warranty as part of the "Commercial Requirements Amendments" modifying the boilerplate.  See Def. App. Ex. 5 at 16-17.

It does not oblige Schwing to guarantee that its materials
handling system will perform to a certain level over the warranty
period.  Accordingly, a breach of warranty "occurs when tender of
delivery is made."  Conn. Gen. Stat. § 42a-2-725(2).

     In Flagg Energy Development Corp. v. General Motors Corp.,
244 Conn. 126, 151, 709 A.2d 1075, 1087 (Conn. 1998), a case with
very similar facts, the Connecticut Supreme Court expressly
"reject[ed] the ... contention that [a] repair or replacement
clause in [a] purchase agreement tolls the running of the statute
of limitations under § 42a-2-725."  In Flagg, the parties
contracted (via a purchase order) for gas turbine engines for a
construction project.  The engines malfunctioned approximately
1.5 years after acceptance by the plaintiff, and the plaintiff
claimed that because the contract included a repair or
replacement clause for defective materials or equipment, the
statute of limitations started to run on the date of the
malfunction.  The Connecticut Supreme Court held that the
repair/replacement clause in the contract was not a guarantee of
the engines' future performance, i.e. an ongoing contractual
commitment, but merely an additional remedy promised to the buyer
in case of defect, and therefore the statute of limitations
started to run on the date performance was tendered.  See Flagg,
244 Conn. at 150.  Likewise, the replacement-parts warranty
agreed between Alstom and Schwing is not an explicit guarantee of

13

future performance, and thus the statute of limitation began to run when delivery of the goods was tendered.[9]

Because there is no genuine dispute of the material fact that ABB accepted Schwing's materials handling system as of June 23, 2000, Alstom's August 6, 2004 breach of contract claim was filed outside the four-year statute of limitations.  Accordingly, defendant is entitled to summary judgment on Count One.

**B.    Unjust Enrichment**

As an alternative to its breach of contract claim, Alstom alleges a quasi-contractual unjust enrichment claim.  "Unjust enrichment applies whenever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract....  Indeed, lack of a remedy under the contract is a precondition for recovery based upon unjust enrichment."  Gagne v. Vaccaro, 255 Conn. 390, 401, 766 A.2d 416, 424 (Conn. 2001).  In other words, the remedy of unjust enrichment provides that "a plaintiff may recover the benefit conferred on a defendant in situations where

---

[9]Coakley & Williams, Inc. v. Shatterproof Glass Corp., 706 F.2d 456 (4th Cir. 1983), on which plaintiff heavily relies, is distinguishable from this case and from Flagg.  In Coakley, a contractor did replace the allegedly defective parts, and the Fourth Circuit held that the warranty on the replacement parts began to run when the replacements were installed.  706 F.2d at 462-63.  In the present case, Alstom complains not that the replacement parts were defective, but that Schwing breached the contract because the original parts broke.  Accordingly, the warranty period here begins to run upon tender of the original parts.

no express contract has been entered into by the parties." <u>Burns v. Koellmer</u>, 11 Conn. App. 375, 383, 527 A.2d 1210, 1215 (Conn. App. Ct. 1987) (citing 5 <u>Williston on Contracts</u> § 1479 (3d ed. 1970); <u>Restatement of Restitution</u> §§ 40, 41, 107). However, where an express contract exists, restitution for unjust enrichment, a quasi contractual remedy, is unavailable. <u>Lieberman v. Emigrant Mortg. Co.</u>, __F. Supp. 2d__, 2006 WL 1699515, at *6 (D. Conn. June 2, 2006) (Hall, J.) ("Parties who have entered into controlling express contracts are bound by such contracts to the exclusion of inconsistent implied contract obligations.  Proof of a contract enforceable at law precludes the equitable remedy of unjust enrichment.") (quoting <u>Polverari v. Peatt</u>, 29 Conn. App. 191, 199, 614 A.2d 484 (Conn. App. Ct. 1992)).

Here, there is no argument that the parties' express written contract is unenforceable, <u>e.g.</u>, for lack of consideration or lack of mutual agreement.  <u>Cf.</u> <u>Restatement of Restitution</u> § 40(2).  Plaintiff's action on the contract exists; it is simply barred by the statute of limitations.  Therefore, due to the existence of a written contract, plaintiff cannot recover on an unjust enrichment theory, and defendant is entitled to summary judgment on Count Two.[10]

___

[10]Schwing argues that Alstom's unjust enrichment claim also should be barred by a four-year statute of limitations.  The Court finds no Connecticut appellate authority concerning the applicable statute of limitations for unjust enrichment claims; some Superior Courts have applied a six-year period in contracts

## C.   Negligent Misrepresentation

Plaintiff's third count alleges that Schwing negligently misrepresented "certain services, materials, equipment, and products" it provided to plaintiff.  Am. Compl., Third Claim, ¶ 16.  Defendant moves for summary judgment on this count on the grounds that: it is barred by the statute of limitations; Alstom has proffered no evidence of reasonable reliance on Schwing's statements; and Alstom's breach of warranty claim from Count One cannot be combined with a negligent misrepresentation claim. Alstom has not addressed any of these arguments, and appears to have abandoned Count Three.

Even if plaintiff intended to pursue this claim, the Court agrees that it is barred by the applicable three-year statute of limitations.  See Conn. Gen. Stat. § 52-577 (three-year statute of limitations applies to tort actions); Krondes v. Norwalk Sav. Soc., 53 Conn. App. 102, 113-15, 728 A.2d 1103, 1110-11 (1999) (three-year statute of limitation applied to fraudulent

---

not involving the sale of goods.  See Bailey, Moore, Glazer, Schaefer & Proto, LLP v. Hippeau, No. CV054007301S, 2006 WL 573888, at *2 (Conn. Super. Ct. Feb. 22, 2006) (six-year limitations period in quasi-contract action brought by accountant who was not paid for services rendered); Gianetti v. Greater Bridgeport Indiv. Practice Assoc., No. (X02)CV4001686, 2005 WL 2078546, at *4 (Conn. Super. Ct. July 21, 2005) (six-year period applied to nonpayment of debt action).  Defendant argues that a four-year period applies here because Connecticut courts apply the statute of limitations for analogous legal claims to equitable claims, see Dowling v. Finley Assocs., Inc., 248 Conn. 364, 367-68 n.7, 727 A.2d 1245, 1248 n.7 (1999), but the Court need not resolve this unsettled issue of state law.

16

misrepresentation claim).  On the facts of plaintiff's complaint, any misrepresentation concerning the quality of the goods took place either when the contract was formed (Schwing's acceptance took place October 29, 1999), or, at the latest, when the goods were delivered to Redbank on June 20, 2000.  Either point predates the filing of the August 2004 complaint by more than three years.

Moreover, the Connecticut Supreme Court held in Flagg, 244 Conn. at 153, that "commercial losses arising out of the defective performance of contracts for the sale of goods cannot be combined with negligent misrepresentation."  Thus, where the "factual underpinnings" of both claims are identical, a plaintiff is limited to a breach-of-contract claim.  Id. at 155.  Here, the allegations of plaintiff's negligent misrepresentation claim are identical to its breach of warranty claim, namely, that defendant's sliding frame and cylinder components were defective and malfunctioned in May 2001, causing damage to the Redbank plant.  Accordingly, under Flagg, plaintiff cannot maintain this negligent misrepresentation claim.

For these reasons, defendant is entitled to summary judgment on Count Three.

**D.   Insurance Coverage**

Plaintiff's Fourth and Fifth Counts[11] relate to the insurance coverage provisions of the parties' agreement, which requires that "Seller will maintain general liability insurance on an occurrence basis, having limits of not less than $1,000,000 per occurrence ... and naming Purchaser as an additional insured with respect to any claim arising out of Seller's performance hereunder."  Purchase Order, Pl. Ex. B at 18.  It is undisputed that defendants breached this requirement because, although they obtained Commercial General Liability policies with limits of $2 million, ABB/Alstom was not a named insured on these policies. See Insurance policies, Def. App. Ex. 21 (only Schwing entities are named insureds); Def. L.R. 56(a)1 Stmt. ¶ 39 (claiming Schwing had CGL policies in effect but not alleging that the policies named ABB/Alstom).  Schwing did put up a construction bond in ABB's favor of approximately $240,000, or 10% of the contract.  See Def. App. Ex. 20.  However, Schwing does not argue that this bond satisfied its insurance obligation under the agreement.  Rather, Schwing argues that Alstom's insurance coverage claims fail because Alstom has not suffered or claimed any third-party losses for which it sought insurance coverage.

The parties dispute whether Redbank's owners have filed a

---

[11]Count Five does not set forth a separate cause of action but claims costs and attorney fees relating to the insurance coverage claim in Count Four.  Am. Compl. ¶ 29.

claim against Alstom.  At the deposition of Clifton Stalph (Alstom's designated corporate representative knowledgeable about damages), Alstom's attorney stated that Redbank had sued Alstom, but refused to allow Stalph to divulge information about the lawsuit on the grounds of attorney-client privilege.[12]  Stalph Depo., Pl. Surreply Ex. D, at 32-35.  On this basis, plaintiff argues that it "informed" Schwing about the pending Redbank lawsuit, and that this lawsuit is the third-party claim that should be insured.  Pl. Surreply Br. at 5.  Plaintiff's Local Rule 56(a)2 Statement ¶ 40 alleges that Schwing was aware of Redbank's third-party claims "as the result of numerous meetings and communications with plaintiff throughout 2001, 2002, and 2003," but it also frames its cause of action as one for breach of contract for "defendant's failure to honor defendant's indemnity obligations," and acknowledges that Alstom never submitted or attempted to submit an insurance claim to defendant's CGL carrier.  Id.  The record contains no written documentation concerning the Redbank lawsuit, and plaintiff's damages analysis, provided in discovery, makes no claim for any

------

[12]When Stalph was asked whether he prepared a certain damages analysis at the request of an attorney, Alstom's attorney refused to allow Stalph to answer "because it's related to the Red Bank [sic] claim, the recent lawsuit against Alstom."  Stalph Depo., Pl. Surreply Ex. D, at 34.  No further information about the lawsuit appears to have been provided to Schwing in discovery and Alstom does not argue that it actually made a formal claim for coverage related to the Redbank suit.

liability to third party Redbank.  See Def. App. Ex. 22 (claiming
materials, labor and overhead for repairing the sliding frames
and cylinders).

Regardless of whether plaintiff's claim is characterized as
a breach of contract action or an indemnity action related to
Redbank, it is not properly before this Court.  If it is a breach
of contract claim, it is precluded by the statute of limitations,
for the reasons discussed above.  If, as plaintiff now contends,
it is a third-party indemnity action arising from the Redbank
lawsuit, liability for Redbank's damages is properly determined
within or following resolution of Redbank's case.

Under Connecticut law, a cause of action based on an
agreement to indemnify loss accrues when the loss occurs, i.e.,
when the indemnitee "has paid something he is legally obligated
to pay."  Amoco Oil Co. v. Liberty Auto and Elec. Co., 262 Conn.
142, 150, 810 A.2d 259, 264 (Conn. 2002).  A cause of action
based on an agreement to indemnify liability "would accrue as
soon as an indemnitee becomes liable to a third party."  Id.
"When an agreement indemnifies against both loss and liability,
... the statute of limitations begins to run as soon as liability
is incurred....  Thus, the first moment in time when an
indemnitee can successfully maintain an action to enforce the
terms of an indemnity agreement ... is when liability is
incurred."  Id. at 150-51.  Connecticut statute provides that "an

20

action for indemnification may be brought within three years from the date of the determination of the action against the party which is seeking indemnification <u>by either judgment or settlement</u>."  Conn. Gen. Stat. § 52-598a (emphasis supplied). Thus, the earliest appropriate time to bring an indemnification action is after the indemnitee's liability to a third party has been determined "by either judgment or settlement."  The record in this case contains nothing about the Redbank lawsuit, and certainly does not establish that Alstom has been found liable to Redbank via a judgment or settlement.  Therefore Alstom's indemnification action is premature.

The fact that Alstom seeks a declaratory judgment rather than money damages does not change this analysis, because even a declaratory judgment concerning whether Schwing is liable for Alstom's damages stemming from Redbank's suit would ask this Court to impermissibly determine whether Schwing must indemnify Alstom prior to final determination of liability in the Alstom-Redbank case.  Not only is this improper under Connecticut law, it would be inefficient, as this Court would be asked to duplicate determinations to be made in the Redbank case.

Alternatively, if Alstom seeks only a declaratory judgment that Schwing breached the contract by failing to name Alstom as an additional insured, this does not present an actual case or controversy between the parties in the absence of any showing

that Alstom suffered tangible injury caused by Schwing's failure to name Alstom on the policy – a showing that could only be made, if ever, after Alstom was found liable to Redbank.

Thus, however plaintiff seeks to characterize its claim related to the contract's indemnity provision, it is not one on which this Court can grant relief.

**E.   CUTPA/CUIPA/Negligent Misrepresentation as to Insurance**

Plaintiff has not briefed its CUTPA/CUIPA claim (Count Six) or its negligent misrepresentation claim as to insurance coverage (Count Seven).  The allegations in the complaint are similar to Count Four, alleging that Schwing misrepresented that it would name Alstom as an additional insured on its CGL policies for the Redbank project but neglected to do so.

The statute of limitations under CUTPA and CUIPA is three years from the date of the act or omission complained of.  Conn. Gen. Stat. § 42-110g(f); Conn. Gen. Stat. § 52-577; Grant v. City of New Haven, No. 382068, 1998 WL 59472, at *2 (Conn. Super. Ct. Feb. 3, 1998).  Here, plaintiff complains that Schwing misrepresented in the terms of the written contract that it would name Alstom as an additional insured on its CGL policy but failed to do so.  The latest date on which the action could have accrued, therefore, is the date the contract was formed, in this case October 29, 1999, when the purchase order was executed.  This date falls outside the three-year statute of limitations.

Accordingly, plaintiff's claims under CUTPA and CUIPA are barred and defendant is entitled to summary judgment on those claims.

Plaintiff's negligent misrepresentation claim, also rolled into Count Seven, is based on the identical facts as the CUTPA/CUIPA claim and the breach of contract claim in Count Four, i.e., that defendant promised to name Alstom as an additional insured but failed to do so.  As previously discussed with respect to the negligent misrepresentation claim in Count Three, the Connecticut Supreme Court's ruling in Flagg, 244 Conn. at 153-55, precludes plaintiff from bringing a misrepresentation claim on the identical facts alleged to be a breach of contract. Furthermore, "pecuniary loss" is an element of negligent misrepresentation, and without any showing of damages resulting from Schwing's alleged misrepresentations concerning its insurance coverage, Alstom cannot succeed on its negligent misrepresentation claim.  Sav. Bank of Manchester v. Ralion Fin. Servs., Inc., 91 Conn. App. 386, 389, 881 A.2d 1035, 1037 (Conn. App. Ct. 2005).

For the reasons above, defendants are entitled to summary judgment on the CUTPA, CUIPA and negligent misrepresentation allegations in Count Seven.

**IV.   Conclusion**

Accordingly, defendants' motion for summary judgment [Doc. # 78] is GRANTED in its entirety and this case will be closed.

IT IS SO ORDERED.

/s/

_____
JANET BOND ARTERTON, U.S.D.J.

**Dated at New Haven, Connecticut, this 14th day of September, 2006.**